**In the Matter of JAMES CABLE PARTNERS, L.P., Debtor.**

**JAMES CABLE PARTNERS, L.P., Plaintiff,**

**v.**

**CITIBANK, N.A., National Bank of Detroit, Provident National Bank, the Bank of California, N.A., and Kansallis–Osake–Pankki, Defendants.**

**Bankruptcy No. 91–52221.**
**Adv. No. 91–5118.**

United States Bankruptcy Court, M.D. Georgia, Macon Division.

June 12, 1992.

Morris W. Macey, Michael D. Pinsky, Atlanta, Ga., for plaintiff.

Robert F. Dallas, Jesse H. Austin, III, Powell Goldstein Frazer & Murphy, Atlanta, Ga., for defendants.

ROBERT F. HERSHNER, Jr., Chief Judge.

## STATEMENT OF THE CASE

James Cable Partners, L.P., Plaintiff, filed a petition under Chapter 11 of the Bankruptcy Code on June 26, 1991. Plaintiff filed a complaint against Citibank, N.A., National Bank of Detroit, Provident National Bank, The Bank of California, N.A., and Kansallis–Osake–Pankki, Defendants, on October 2, 1991. Defendants filed their answer to the complaint on November 4, 1991. This adversary proceeding came on for trial on June 9, 1992. The Court, having considered the evidence presented and the arguments of counsel, now enters its findings of fact and conclusions of law.

## FINDINGS OF FACT

Plaintiff is in the cable television business. Plaintiff operates ten cable systems that are located in several states. Plaintiff does not produce television programs. Rather, Plaintiff purchases franchise rights from community governments, which allow Plaintiff to serve the communities with cable television service. Plaintiff, through its equipment, receives television signals from satellites. Plaintiff sends these signals through its cable network to subscribers. William James describes Plaintiff as being "a conduit for the signal." Subscribers pay a monthly fee to receive these signals. Plaintiff's revenue comes from subscribers' monthly fees, installation charges, and advertising. Subscribers pay for service in advance. Subscribers are disconnected if they fail to pay within sixty days. Subscribers' accounts are identified by the subscriber's address.

When a potential subscriber calls requesting installation service, Plaintiff enters basic information into its computer. This information includes the subscriber's name, address, and date installation is requested. In some cases, the computer generates a work order. In some other cases, Plaintiff's representative telephones or sends a fax to a technician concerning the service request. There is no formal written agreement between Plaintiff and the subscriber.[1] The only written document sent to the subscriber is a monthly bill generated by Plaintiff's computer service.

Plaintiff had 77,567 subscribers when the bankruptcy petition was filed. Plaintiff is constantly opening and closing subscribers' accounts. On June 3, 1992 (six days prior to trial), it had 78,714 subscribers. Most subscribers are single residences. Some subscribers are bulk-service locations, such as hospitals, motels, and jails. Mr. James testified that Plaintiff has acquired 16,467 new subscribers since the filing of its bankruptcy case. Mr. James admits that this figure includes subscribers whose service was terminated for nonpayment and who later were reconnected after bringing their accounts current. The figure also includes individuals who simply moved from one residence to another. Mr. James did not know the number of current subscribers who were not subscribers when the bankruptcy case was filed. Thus, he could not testify as to the number of true new sub-

1. Some local managers have the subscribers sign the work order.

scribers generated by Plaintiff's business since the filing of Plaintiff's bankruptcy case.

Plaintiff admits that Defendants had a perfected security interest in all of Plaintiff's assets, except certain vehicles, before the bankruptcy filing. Plaintiff executed a security agreement in favor of Defendants dated August 31, 1988. This agreement provides, in part:

SECTION 1. *Grant of Security ....*

. . . .

(d) All accounts, general intangibles (including, but not limited to, all: tax refunds; television film exhibition rights; know how, trade secrets, engineering plans, computer software, drawings and other proprietary information and all licenses (except to the extent applicable law prohibits the Borrower from granting a security interest in any license granted by the Federal Communications Commission)), contract rights (including, but not limited to, all rights of the Borrower with respect to all advertising, programming, franchise, network affiliation, deposit escrow, bulk subscriber, subscriber escrow, closing escrow, pole attachment, programming and license agreements (except to the extent such agreements prohibit the Borrower from granting to the Agent a security interest in such rights, all such agreements to the extent not so excepted being the *"Assigned Agreements"*) and all rights of the Borrower to receive capital contributions from its limited partners pursuant to the Agreement of Limited Partnership and all rights to receive moneys due and to become due under or pursuant to any accounts, general intangibles and contract rights and all of the rights of the Borrower to terminate, and to perform, compel performance and otherwise exercise all rights and remedies under, such accounts, general intangibles and contract rights, chattel paper, instruments and other obligations of any kind, now or

hereafter existing, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services, and all rights now or hereafter existing in and to all mortgages, security agreements, leases and other contracts securing or otherwise relating to any such cash, accounts, general intangibles, contract rights, chattel paper, instruments or other obligations (any and all such cash, accounts, general intangibles, contract rights, chattel paper, instruments and obligations being the *"Receivables"*, and any and all such mortgages, security agreements, leases and other contracts being the *"Related Contracts"*);

(e) All proceeds of any and all of the foregoing collateral (including, without limitation, proceeds that constitute property of the types described in clauses (a), (b), (c) and (d) of this Section 1) and, to the extent not otherwise included, all payments under insurance (whether or not the Agent is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral.

Plaintiff does not contest that Defendants have a perfected security interest in all of Plaintiff's "hard assets," such as equipment. Plaintiff uses these "hard assets" to receive and deliver satellite signals to subscribers.

## CONCLUSIONS OF LAW

Plaintiff contends that its postpetition revenues are not encumbered by Defendants' security interest. Property that a bankruptcy estate acquires postpetition generally is not subject to a prepetition security agreement, even if the agreement contains an after-acquired property clause.[2] However, if the prepetition agreement and applicable nonbankruptcy law so provide, the security interest attaches to postpeti-

---

**2.** 11 U.S.C.A. § 552(a) (West 1979). This section provides:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the

case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case. 11 U.S.C.A. § 552(a) (West 1979).

tion proceeds, product, offspring, rents, and profits of property, which are subject to the prepetition security interest.[3]

Plaintiff and Defendants disagree as to how section 552 applies to Plaintiff's postpetition revenues. These revenues are generated from cable installation, monthly cable service, and advertising.

■ The nature and extent of security interests are determined by state law. *Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.)*, 944 F.2d 500, 502 (9th Cir.1991). The security agreement provides that New York law will govern.

Plaintiff does not enter into a written contract with its subscribers. Plaintiff contends that it simply provides service on a month-to-month basis. Most subscribers continue the service until they move or fail to pay their bills. It is clear that both Plaintiff and its subscribers expect their relationship to be ongoing. The Court is persuaded that Plaintiff and its subscribers had an agreement[4] concerning their relationship. This agreement was memorialized, in part, by Plaintiff's computer records and by the monthly bills sent to subscribers. Plaintiff does not contest that before bankruptcy, its performance under the subscribers' agreements generated revenues to which Defendants' security interest attached.

Plaintiff contends that Defendants' security interest "extends to subscribers revenue only as the proceeds of accounts." Plaintiff contends that accounts receivable

generated postpetition are after-acquired property not subject to the proceeds exception of section 552(b). *See In re Bering Trader, Inc.*, 944 F.2d at 502; *New Hampshire Business Development Corp. v. Cross Baking Co. (In re Cross Baking Co.)*, 818 F.2d 1027, 1032 (1st Cir.1987).

Section 9–306(1) of the New York U.C.C. provides:

(1) "Proceeds" includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Money, checks, deposit accounts, and the like are "cash proceeds". All other proceeds are "noncash proceeds".

N.Y.U.C.C. § 9–306(1) (1991).

The legislative history of section 552(b) provides:

The term "proceeds" is not limited to the technical definition of that term in the U.C.C., but covers any property into which property subject to the security interest is converted. (H.Rept. No. 95–595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977) p. 376, 377, U.S.Code Cong. & Admin.News pp. 5787, 6333.)

The legislative history of section 552 also provides:

[Section 552] applies to all security interests as defined in section 101 of the bankruptcy code, not only to U.C.C. security interests. H.Rept. No. 95–595 to

**3.** 11 U.S.C.A. § 552(b) (West Supp.1992). This section provides:

(b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and

based on the equities of the case, orders otherwise.

11 U.S.C.A. § 552(b) (West Supp.1992).

**4.** Section 1–201(3) of the New York U.C.C. provides:

(3) "Agreement" means the bargain of the parties in fact as found in their language or *by implication from other circumstances including course of dealing* or usage of trade or course of performance as provided in this Act (Sections I—205 and 2—208). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts (Section 1—103). (Compare "Contract".)

N.Y.U.C.C. § 1–201(3) (1991) (emphasis added).

accompany H.R. 8200, 95th Cong., 1st Sess. (1977) pp. 376, 377, U.S.Code Cong. & Admin.News pp. 5787, 6332.

It is clear that the coverage of section 552 is broader than that of the U.C.C. In the Court's view, this adversary proceeding presents the issue of how section 552 of the Bankruptcy Code alters the rights of Plaintiff and Defendants under the August 31, 1988, security agreement.

Plaintiff relies on *First National Bank of Atlanta v. Willis (In re Jones).* [5] In *Jones,* the creditor held a security interest on the cash value of debtor's whole life insurance policy. After the debtor filed his bankruptcy petition, his wife and son continued to pay the premiums from their personal funds. The creditor contended that the increase in the cash surrender value after the bankruptcy petition was filed was part of the security for the loan. The creditor contended that the increase in value was either an inseparable part of its interest in the policy or represented proceeds of its collateral. The circuit court of appeals stated:

[W]e follow the reasoning set forth in the Bankruptcy Court's Memorandum Opinion. An analogy was made to bank accounts in which a creditor has a security interest into which deposits are made post-petition. In that situation, the bankruptcy court has held that any lien that a creditor has on the bank account is limited to the amount on deposit at the time that the case commenced. *In re Executive Associates,* 24 B.R. 171 (Bankr. S.D.Tex.1982). The subsequent post-petition deposits into a bank account are very similar to subsequent post-petition payments of premiums that increase the cash surrender value of a life insurance policy. In addition, analogies can also be drawn to post-petition account receivables. *In re Walker,* 35 B.R. 237 (Bankr. N.D.Ga.1983) (the post-petition receivables were implicitly held to be property "acquired by the estate or by the debtor after the commencement of the case").

The increased cash surrender value of the life insurance policy is not any form of "proceeds, product, offspring, rents, or profits" within the meaning of § 552(b). In other words, the subsequent premium payments made by the debtor's wife and son from their own separate assets which occurred from the date of the filing of the debtor's Chapter 11 petition to its conversion to Chapter 7 was property of the estate and such funds are not subject to First Atlanta's lien.

908 F.2d at 861.

*Jones* is distinguishable from the case at bar. In *Jones* the increase in cash surrender value came from postpetition payments made from nonbankruptcy assets. The increase did not arise from the insurance policy itself. In the case at bar, Defendants' collateral was used to generate the postpetition revenues.

Plaintiff, in its trial brief, contends that "no right to payment from a subscriber arises (no property right in the Debtor is created) until the Debtor provides cable television services to that subscriber. Unless and until the Debtor provides these services, Debtor's subscribers have no obligation to make payments to the Debtor. If Debtor does not provide these services, no account is created, and Debtor will have no rights in such account or proceeds therefrom. Furthermore, the Banks' security interest does not attach to Debtor's accounts until such time as Debtor has rights in the collateral."

Mr. James testified, however, that subscribers are billed for services in advance, not in arrears. Most current subscribers were subscribers when this bankruptcy case was filed. They continue to receive services pursuant to the same agreement that they had with Plaintiff prior to the filing. This postpetition service is merely an extension or continuation of the prepetition agreement. Plaintiff and its subscribers expected an ongoing relationship, and this is exactly what is happening. Defendants have a perfected security interest in the "hard assets" that receive and deliver the television signals. Plaintiff does not

5.   908 F.2d 859 (11th Cir.1990).

dispute that Defendants' security interest attached to revenues generated prepetition. The Court is persuaded that Defendants have a security interest in the postpetition payments received from subscribers who were subscribers when the bankruptcy petition was filed.

Some current subscribers were not subscribers when the bankruptcy was filed. These subscribers were acquired by the postpetition advertising and efforts of Plaintiff. Plaintiff did not have a prepetition agreement with these subscribers. The Court is persuaded that the payments from these agreements are not subject to Defendant's security interest because of section 552(a). Defendants also would have no claim to the installation fees and advertising revenues generated by Plaintiff postpetition.

From the evidence presented, the Court is unable to determine the number of new accounts generated by Plaintiff postpetition. The parties are directed to confer within thirty days of this Court's order to reach an agreement on the number of truly new subscribers' accounts generated postpetition. If the parties cannot agree, then Plaintiff is directed to report the impasse to the Court, and the Court will schedule a hearing.

An order in accordance with this memorandum opinion will be entered this date.

### ORDER

In accordance with the memorandum opinion entered this date; it is

ORDERED that Citibank, N.A., National Bank of Detroit, Provident National Bank, The Bank of California, N.A., and Kansallis–Osake–Pankki, Defendants, are hereby determined to have a valid lien against the postpetition revenues generated by the subscriber agreements in existence at the time of the filing of the bankruptcy case of James Cable Partners, L.P., Plaintiff; and it is further

ORDERED that Defendants have no lien against the postpetition revenues generated by the subscribers' agreements, which have come into existence postpetition; it is further

ORDERED that Defendants have no lien against the installation fees and advertising revenues generated by Plaintiff postpetition; and it is further

ORDERED that the parties are directed to confer within thirty days of this order to reach an agreement on the number of truly new subscriber agreements generated postpetition. If no agreement is reached, Plaintiff is directed to notify the Court.

SO ORDERED.